UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-10036-Civ-KING
    (03-10016-Cr-KING)
MAGISTRATE JUDGE P. A. WHITE

MIAKEL GUERRA MORALES,              :

          Movant,                    :

                                     :          REPORT OF MAGISTRATE
v.                                   :           JUDGE FOLLOWING
                                                EVIDENTIARY HEARING

UNITED STATES OF AMERICA,           :

          Respondent.                :
_____

Introduction

This matter is before this Court on the movant's timely filed motion to vacate pursuant to 28 U.S.C. §2255, attacking his conviction and sentence for conspiracy to commit aircraft piracy, in violation of 49 U.S.C. §46502(a)(2) (Count One); aircraft piracy, in violation of 49 U.S.C. §46502(a)(1)(A) (Count Two); conspiracy to interfere with a flight crew, in violation of 29 U.S.C. §46504 (Count Three) and interference with a flight crew, in violation of 49 U.S.C. §46504 (Count Four), entered following a jury verdict in Case No. 03-10016-Cr-King.

The Court has reviewed the motion (Cv-DE#1), the government's answer (Cv-DE#8), the movant's reply (Cv-DE#10), the Pre-sentence Investigation Report (PSI), and all pertinent portions of the underlying criminal file.

<u>Claims Raised</u>

Construing the movant's arguments liberally as afforded *pro se* litigants pursuant to <u>Haines v. Kerner</u>, 404 U.S. 419 (1972), the movant appears to raise the following claims in his §2255 motion:

1.   The movant was denied effective assistance of counsel when his attorney failed to file a direct appeal after being requested to do so. (Cv-DE#1:4).

2.   The movant was denied effective assistance of counsel when his attorney failed to argue at sentencing for an acceptance of responsibility adjustment and move for a downward departure based on post-offense rehabilitation. (Cv-DE#1:5).

3.   The movant was denied effective assistance of counsel when his attorney failed to move to suppress his post-arrest statement. (Cv-DE#1:6-7).

4.   The movant was denied effective assistance of counsel when his attorney failed to advise him of the benefits of pleading guilty versus proceeding to trial. (Cv-DE#1:8).

5.   The movant was denied effective assistance of counsel when his attorney failed to advise the movant of his right to exercise his Fifth Amendment privilege against self-incrimination at trial. It appears the movant contends that counsel failed to inform him that he had a right to remain silent at trial and counsel failed to discuss the option with him or the strategy in

remaining silent as opposed to testifying and the consequences thereof. (Cv-DE#1:10).

6.   The movant was denied effective assistance of counsel when his attorney failed to challenge a two-level enhancement pursuant to U.S.S.G. §3A1.3 for restraint of victim at sentencing. (Cv-DE#1:12).

7.   The movant was denied effective assistance of counsel when his attorney failed to object to the grouping of the offenses in the PSI. (Cv-DE#1:12).

To the extent the movant seeks to adopt the claims raised by Co-Defendants Neudis Infantes Hernandez (08-10009-Civ-King) and Alexis Norneilla Morales (08-10038-Civ-King), they are hereby incorporated by reference and are denied for the reasons set forth by this Court in the Report and Recommendation in their respective cases.

After review of the record, it was determined that evidentiary findings and oral argument was required with respect to **claims one, four and five**, as listed above. An order was entered appointing Phillip Horowitz, Esquire, to represent the movant, and an evidentiary hearing was thereafter scheduled for July 9, 2009.

Factual History

The movant's conviction arises from the hijacking of an aircraft bound for Havana from Nueva Gerona, Cuba, that was diverted to Key West, Florida on March 19, 2003. Captain Daniel Blas Corria Sanchez, a pilot employed by Aerotaxi, an airline owned and operated by the Cuban Civil Aviation System, was scheduled to

3

pilot a DC-3 aircraft on a round-trip flight between Havana and Nueva Gerona, a town located on the Cuban Island, Isle of Youth. (Cr-DE#333:51-53). Captain Sanchez testified at trial that the crew aboard the aircraft consisted of: co-pilot Gustavos Salas Cleger, flight technician Raciel Pena Turro, steward Abilio Hernandez Garcia, security guard Lazaro Samosa, and flight engineer Eladio Viera. (Cr-DE#333:52-3;Cr-DE#334:101,184). Before departing Havana, the plane was filled with 400 gallons of aviation fuel, despite only needing 330 gallons for the round trip, because the fuel gauges were very unreliable. (Cr-DE#333:56-7;Cr-DE#334:182).

After landing in Nueva Gerona, Captain Sanchez obtained return flight information, the crew re-boarded the plane and locked the cockpit, and the steward then assisted 31 passengers to board the aircraft, which departed Nueva Gerona on a return flight to Havana. (Cr-DE#33:62; Cr-DE#335:22). Captain Sanchez piloted the aircraft, while Cleger handled the communications and navigation. (Cr-DE#333:61). The flight engineer and flight technician were behind the pilots, while the security guard sat in a fold-up seat attached to the cockpit door. (Cr-DE#333:61; Cr-DE#334:184-85).

When the aircraft was approximately 9 nautical miles from Havana, the crew heard a loud bang, and the flight technician at first believed they had lost an engine. (Cr-DE#333:78; Cr-DE#334:185). A second bang was heard coming from the cockpit door, as co-defendant, Yanier Olivares-Samon, slammed his body against the door in order to gain entry into the cockpit area. (Cr-DE#333:63-64;  Cr-DE#335:17-20,24-26,110-11,144,148).  The two hijackers entered the cockpit area, with Olivares-Samon holding one of the airplane's emergency axes in his hands during the flight, while the other hijackers held knives or axes in order to guard the crew   and   passengers.   (Cr-DE#333:79-81;Cr-DE#334:137-138;Cr-

DE#335:31-33).  In the interim, the security guard was struggling with an individual wielding a knife, and the flight technician grabbed an axe, but stopped when he heard shouting in the passenger cabin that the hijackers had taken children hostage. (Cr-DE#334:188-92).

Co-defendant Norneilla-Morales then entered the cockpit, held a knife to Captain Sanchez' throat, demanded that he reroute the plane from Havana to Miami, keeping the knife firmly pressed on the captain's throat thereby restricting his movements. (Cr-DE#333:71-72; Cr-DE#334:137).  Norneilla-Morales did, however, permit the crew to contact the Havana air traffic control tower and notify them that the plane had been hijacked. (Cr-DE#333:72-75; Cr-DE#334:71). Despite being advised that there was insufficient fuel for the plane to reach Miami, he nonetheless instructed the captain to continue on the scheduled route. (Cr-DE#334:49-50,73-5).  The captain, however, became concerned that the hijackers intended to ditch the plane in the ocean. (Cr-DE#333:76-77; Cr-DE#334:49-50,73-75).

Flight Technician Turro testified that Norneilla-Morales shoved him, the security guard, and flight engineer out of the cockpit down the aisle towards the rear of the plane. (Cr-DE#334:194-97).  Turro felt a knife pressed against his back as he was being pushed down the aisle. (Id.).  The hijackers then tied their hands, and Turro was thrown on top of the steward, who was lying on the floor of the cabin, with his hands also bound. (Id.). According to Turro, before the aircraft landed, he heard one of the hijackers threaten to kill them if they observed any Cuban police cars outside the plane. (Cr-DE#334:194-97).

Captain Sanchez identified Olivares-Samon in court as the

second man to enter the cockpit, explaining that Olivares-Samon stood next to Norneilla-Morales during the flight, holding the emergency axe until after the aircraft's arrival at Key West. (Cr-DE#333:79-81).

Turro, the technician, testified that after the second hijacker, the one without the knife, took Turro's emergency axe, a third hijacker came to the area outside the cockpit and remained there for most of the trip, except when he and the second hijacker shoved Turro, Viera and Samosa down the aisle to the rear of the passenger cabin. (Cr-DE#334:194-197). Turro felt a knife against his back as he was being pushed down the aisle. (Id.). The hijackers tied their hands and Turro was thrown on top of the steward, who was lying on the floor of the cabin, hand bound. (Id.).

Garcia, the steward, testified that after assisting the passengers board the aircraft, he passed out refreshments and flight surveys. (Cr-DE#335:17-20). Then, while he cleaned up the galley, he observed a tall male passenger walk towards him, suddenly turn, run, and slam his body against the cockpit door. (Id.:23-24). Despite shouting at the passenger, the man slammed his body against the cockpit door a second time. (Id.). The passenger was identified in court as Olivares-Samon. (Id.:25-26).

As Garcia started towards Olivares-Samon to stop him, he was grabbed from behind, a knife pressed against his throat from his right side, and two hijackers pushed him face down to the floor of the cabin, (Cr-DE#335:24-25) then held a knife to his throat as they bound his hands behind him with a cord, and wrapped the cord with a tape. (Id.:26-27,31). The hijackers told Garcia not to resist, or they would kill him, and left him on the floor.

(<u>Id.</u>:28). Garcia was able to observe his assailants, Neudis Infantes Hernandez and the movant, Miakel Guerra Morales. (<u>Id.</u>:28-29). When Garcia began to run out of breath due to Turro and Samosa being thrown on top of him, while still holding the knives, Hernandez and the movant propped him against the bathroom door, facing the cockpit. (<u>Id.</u>:29-30).

Garcia, with a full view of the aircraft, observed Olivares-Samon standing near the cockpit area holding the aircraft emergency axe in his hands. (Cr-DE#335:32-33). Hernandez and the movant, while still holding knives, stayed at the rear of the cabin, guarding the crew. (<u>Id.</u>:30-31).

Florida Air National Guard, Major Jaime Myers testified that on March 19, 2003, he noticed an aircraft make a 90 degree turn north, twelve seconds after its transponder started to emit the 7500 hijack signal. (Cr-DE#333:20-37). Fighter jets were then sent out to intercept the aircraft, and ultimately the hijacked aircraft was escorted to the Key West airport. (Cr-DE#333:42-45). After discussions with two hijackers, the passengers disembarked from the plane, and several suspected hijackers were segregated, and ultimately arrested. (Cr-DE#335:160-167). Five knives and two sheaths were thrown by the hijackers onto the tarmac, and two more sheaths were found aboard the plane, along with a hatchet, cord and tape used to bind the crew, a role of tape, and the battered-in cockpit door. (Cr-DE#334:153-65).

After being read his <u>Miranda</u> rights by Agent Heck, the movant informed her that he had been involved in the takeover plan for six months, that others were involved, and that pursuant to a prearranged signal, he stood up and pulled out his knife. (Cr-DE#336:46-47). He was to guard the crew, but he also told the

7

passengers to stay calm and that they were going to the United States. (Id.:47-48). Two others brought the crew to him at the rear of the aircraft, where the crew was tied up. (Id.:48). One man stayed in the rear with him, and the other returned to the cockpit. (Id.:49). He further explained that the knives had been placed in a duffel bag and hidden in the airport bathroom, that two persons had brought the knives past security and he was given a knife prior to boarding. (Id.:49-50).

## Procedural History

On August 28, 2003, the movant was charged by Superseding Indictment with conspiracy to commit aircraft piracy in the special aircraft jurisdiction of the United States, in violation of 49 U.S.C. §46502(a) (Count 1), aircraft piracy, in violation of 49 U.S.C. §46502(a)(2) and (a)(2)(A), and 18 U.S.C. §2 (Count 2), conspiracy to interfere with a flight crew, in violation of 49 U.S.C. §46504 (Count 3), and interference with a flight crew, in violation of 49 U.S.C. §46504 (Count 4). (Cr-DE#232).

Prior to trial, the government filed a renewed motion *in limine* seeking to preclude the movant from asserting or presenting evidence regarding the affirmative defenses of necessity, duress, or justification. (Cr-DE#231). On November 14, 2003, the district court entered an order granting the government's motion. (Cr-DE#274). The movant proceeded to trial, where he was found guilty as charged, following a jury verdict. (Cr-DE#324).

A PSI was prepared in anticipation of sentencing, wherein the movant was assessed a base offense level of 38 for an offense involving aircraft piracy. (PSI¶25). However, two points were added because several of the aircraft crew members were physically

8

restrained in the course of the offense. (PSI¶27). Notwithstanding, during sentencing, the court did not increase the base offense level for restraint of victim, however, it did increase it by two levels for obstruction of justice. (Cv-DE#8,Ex.B). Accordingly, the movant's base offense level was set at 40. (PSI¶33).

The probation officer further determined the movant had zero criminal history points and a criminal history category of I. (PSI¶36). Based on a total offense level of 40 and a criminal history category of I, the guideline imprisonment range was 292 to 365 months. (PSI¶58).

On April 21, 2004, the movant was sentenced to four concurrent terms of 292 months in prison, followed by a total of 3 years supervised release. (Cr-DE#431).

The movant appealed (Cr-DE#443) and on May 22, 2006, the Eleventh Circuit affirmed his conviction, but remanded for re-sentencing pursuant to United States v. Booker, 543 U.S. 220 (2005). (Cr-DE#491). The Court stated that the Booker error occurred when the Court imposed a mandatory 52 month enhancement of the movant's sentence for obstruction of justice. (Id.). This, however, was beyond the statutory mandatory minimum sentence of 240 months' imprisonment for his convictions on Counts 1 and 2 of the indictment.

Thereafter, on April 25, 2007, the District Court re-sentenced the movant to 264 months imprisonment and 3 years of supervised release as to each count to run concurrently and a $400 special assessment. (Cr-DEs#555,557,597). The amended judgment was entered by the Clerk on April 27, 2007. (Cr-DE#556). No direct appeal was filed from the re-sentencing. The judgment of conviction in the

underlying criminal case became final at the latest on May 11, 2007, ten days after the entry of judgment, when time expired for filing a notice of appeal.[1] This motion to vacate was filed less than one year later on April 24, 2008.

## Evidentiary Hearing

In his motion, the movant asserts that his lawyer was ineffective because counsel failed to file a direct appeal, after being requested to do so, counsel failed to advise him regarding the benefits of pleading guilty versus proceeding to trial and counsel failed to advise the movant of his right to exercise his Fifth Amendment privilege against self-incrimination at trial. The claims were not conclusively refuted by the record, and warranted further evidentiary findings. At the July 9, 2009 evidentiary hearing, testimony was taken from the movant and his criminal defense attorney, Ana Jhones, Esq.

*The Law: Failure to File Direct Appeal*

A criminal defendant is entitled to effective assistance of counsel on direct appeal, regardless of whether counsel is retained or appointed.  Evitts v. Lucey, 469 U.S. 387, 395 (1985). When a defendant alleges that "counsel is ineffective for not filing a notice of appeal when the defendant has not clearly conveyed his

---

[1]Where, as here, a defendant does not pursue a direct appeal, the conviction becomes final when the time for filing a direct appeal expires. Adams v. United States, 173 F.3d 1339, 1342 n.2 (11th Cir. 1999).  The time for filing a direct appeal expires ten days after the judgment or order being appealed is entered.  Fed.R.App.P. 4(b)(1)(A)(I).  The judgment is "entered" when it is entered on the docket by the Clerk of Court.  Fed. R. App. P. 4(b)(6).  On December 1, 2002, Fed.R.App.P. 26; which contains the rules on computing and extending time, was amended so that intermediate weekends and holidays are excluded from the time computation for all pleadings due in less than 11 days.

wishes one way or the other," the Court must engage in the following inquiry. First, determine whether counsel actually consulted with the defendant about an appeal. If so, counsel is only ineffective if he failed to file an appeal after being requested to do so. Roe v. Flores-Ortega, 120 S. Ct. 1029 (2000).

Counsel's failure to file a direct appeal after being requested to do so by his client results in a per se constitutional violation of the movant's Sixth Amendment right to counsel, which entitles the movant to an appellate proceeding. Roe v. Flores-Ortega, 120 S. Ct. 1029 (2000)("we have long held that a lawyer who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable"). Appellate counsel must both file a notice of appeal and file a brief to perfect the appeal and perform effectively as an advocate. Cannon v. Berry, 727 F.2d 1020 (11th Cir. 1984); Mylar v. Alabama, 671 F.2d 1299 (11th Cir.), rehearing denied en banc, 677 F.2d 117 (1982); Perez v. Wainwright, 640 F.2d 596 (5th Cir. 1981).

*The Law: Benefits of Pleading Guilty v. Trial*

The Sixth Amendment right to counsel includes the right to competent advice regarding the choice to accept a plea bargain or go to trial. Turner v. Tennessee, 664 F.Supp. 1113, 1120 (M.D. Tenn.), aff'd, 858 F.2d 1201 (6th Cir. 1988), vacated on other grounds, 492 U.S. 902 (1989), reinstated, 726 F.Supp. 1113 (M.D. Tenn. 1989), aff'd, 940 F.2d 1000 (1991), cert.denied, 502 U.S. 1050 (1992); accord, Johnson v. Duckworth, 793 F.2d 898, 900-02 (7th Cir.), cert.denied, 479 U.S. 937 (1986)(criminal defendant has right to effective assistance of counsel in deciding whether to accept or reject proposed plea agreement); United State ex rel.

<u>Caruso v. Zelinsky</u>, 689 F.2d 435, 438 (3rd Cir. 1982)(decision to reject plea agreement is critical stage at which right to effective assistance attaches); <u>Beckham v. Wainwright</u>, 639 F.2d 262, 267 (5th Cir. 1991)(incompetent advice to withdraw negotiated plea and proceed to trial violated defendant's Sixth Amendment right).

A lawyer is obligated to keep the client informed of important developments, including any plea agreement offered by the government. Counsel's failure to do so is ineffective assistance. <u>Diaz v. United States</u>, 930 F.2d 832, 834 (11th Cir. 1991), <u>citing</u>, <u>Johnson v. Duckworth</u>, <u>supra</u>; <u>see also</u>, <u>Pham v. United States</u>, 317 F.3d 178, 182-83 (2d Cir. 2003)(defense counsel's failure to inform defendant of government's "global plea offer" constituted ineffective assistance); <u>Jones v. Wood</u>, 114 F.3d 1002, 1012 (9th Cir. 1997)(failure to inform client of plea bargain may have risen to the level of ineffective assistance of counsel if petitioner had shown prejudice); <u>United States v. Rodriquez</u>, 929 F.2d 747, 752 (1st Cir. 1991)("Ordinarily, counsel's failure to inform client of plea agreement constitutes ineffective assistance of counsel."); <u>United States v. Zelinsky</u>, 689 F.2d 435, 438 (3rd Cir. 1982)("It would seem that, in the ordinary case, a failure of counsel to advise his client of a plea bargain would constitute a gross deviation from accepted professional standards.").

In reviewing ineffective assistance of counsel with respect to guilty pleas, the United States Supreme Court has applied the "objective standard of reasonableness" by considering whether counsel's representation was "within the range of competence demanded of attorneys in criminal cases." <u>Hill v. Lockhart</u>, 474 U.S. 52, 56-57 (1985)(applying <u>Strickland</u> requirements to review for ineffective assistance of counsel with respect to guilty pleas (citations omitted)). With regard to the prejudice prong, the Court

held that the inquiry focused on "whether counsel's constitutionally ineffective performance affected the outcome of the plea process." <u>Hill</u>, 474 U.S. at 59. If it is found that counsel failed to inform his client of the government's plea offer, the remedy is for the District Court to ensure that the government reinstates its original plea offer. <u>United States v. Baylock</u>, 29 F.3d 1458, 1468 (9th Cir. 1994).

*The Law: Fifth Amendment Privilege to Testify at Trial*

A criminal defendant has a fundamental constitutional right to testify in his or her own behalf at trial. <u>Rock v. Arkansas</u>, 483 U.S. 44, 49-52 (1987); <u>United States v. Teaque</u>, 953 F.2d 1525, 1532 (11 Cir. 1992) (<u>en banc</u>). This right is personal to the defendant, and cannot be waived by the trial court or defense counsel. <u>Teaque</u>, <u>supra</u>; <u>Brown v. Artuz</u>, 124 F.3d 73, 77-78 (2 Cir. 1997).

The proper vehicle for an argument that a defendant's right to testify was violated by his trial counsel is a claim of ineffective assistance of counsel, which requires analysis under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). <u>Gallego v. United States</u>,174 F.3d 1196 (11th Cir. 1999)(citing <u>Teaque</u>, 953 F.2d at 1534); <u>Brown</u>, 124 F.3d at 79-80; <u>Sexton v. French</u>, 163 F.3d 874, 882 (4th Cir. 1998). <u>United States v. Tavares</u>, 100 F.3d 995, 998 (D.C. Cir.1996).

Under this inquiry, proof by a defendant that his counsel never informed the defendant of his right to testify, would suffice to meet the first prong of the <u>Strickland</u> test: that counsel's performance fell below an objective standard of reasonableness. <u>Teaque</u>, 953 F.2d at 1534. Therefore, a proffer of such proof in a §2255 motion would necessitate further factual inquiry if it

appears that the second <u>Strickland</u> prong, prejudice, may also be met.

*Testimony: The movant*

According to the movant's testimony, on March 19, 2003, he was arrested in Key West, Florida in connection with a hijacking of a Cuban passenger plane. During his initial appearance in Key West's federal court, Ana Jhones was appointed counsel and she continued representing him for about four and a half years thereafter. The movant remained in Key West for a week before being transferred to the Federal Detention Center in Miami, Florida. Then, two weeks prior to the commencement of trial, December 1, 2003, he was once again transferred to Key West.

During pre-trial meetings, the movant, along with his brother, Norneilla-Morales, met with counsel several times. According to the movant, discussions were never had regarding the possibility of pleading guilty. Despite not being informed of the option to plead guilty, the movant maintains he continuously suggested to counsel that he wanted to resolve the case without proceeding to trial. However, counsel would inform him that in light of the 20-year mandatory minimum, trial was the only possibility of receiving a lower sentence. Moreover, he asserts that counsel failed to inform him of the plea negotiations with the government, including the option to cooperate for the possibility of receiving a downward departure pursuant to a 5K1 or a Rule 35 motion.

The movant, while in jail, met a hijacker of a plane that was taken from Cuba to Miami, Florida twelve days after the movant's offense. After speaking with the hijacker, the movant learned that, pursuant to a plea agreement, he was offered eight years

14

imprisonment. Thereafter, the movant informed counsel of the prisoner's deal, which counsel found ludicrous.

The movant was never informed of his right to testify or to remain silent. Rather, prior to trial, counsel, along with the other defendants' attorneys determined how the defense would proceed. Thereafter, the movant was informed by counsel, that it was necessary for him to testify, without an explanation that the decision to do so was solely his.

Moreover, after his re-sentencing, the movant informed counsel that he wanted to appeal the sentence. Counsel subsequently visited the movant within the ten-day period in which to file an appeal, at which time, he informed counsel to appeal his sentence. Notwithstanding his request, counsel informed the movant there was nothing else possible for the case and thereafter filed a motion to withdraw as counsel and provided him a letter, written May 1, 2007, confirming their decision to not pursue an appeal. Despite the contents stated therein, the movant wanted an appeal. Thereafter, he called counsel several times, unable to reach her, he left messages with her secretary.

Moreover, the movant asserts that neither his appellate rights nor the ramifications of filing an appeal were discussed with him after re-sentencing. However, counsel did inform him that the judge, as a consequence of appealing, may sentence him to a greater term of imprisonment.

On cross-examination, the movant explained that the case's joint defense theory was based on the crew's involvement in the hijacking. In order for the jury to hear the defense, the defendants' story had to be told. However, only the attorneys for

15

the movant and his brother, Norneilla-Morales, wanted their clients to testify; the other attorneys disagreed. Similarly, the movant agreed that one of them had to testify, but he believed it was best if only his brother, as the leader of the hijacking, should have done so; Norneilla-Morales testified. Notwithstanding Norneilla-Morales' testimony, the movant's testimony added facts to the story that his brother's testimony was unable to accomplish. Eventually the movant acknowledged that because the other four attorneys were adamant that their clients not testify and Norneilla-Morales could only testify as to what occurred in the front of the aircraft, the movant was left with no option but to testify, explaining what occurred in the back of the plane to further support their defense.

Although the movant acknowledged that the May 1, 2007 letter implied that a prior conversation occurred regarding an appeal and that such a conversation did in fact occur, the movant nevertheless wanted to pursue an appeal.

On re-direct, the movant testified that after receiving the May 1, 2007 letter, he continued calling counsel's office because he disagreed with his sentence and wanted an appeal.

*Testimony: Counsel*

Ana Jhones, a seasoned attorney, and the movant's court appointed counsel explained that the defense strategy was determined based on what was represented to her by her client during countless defense meetings. From the beginning, as early as the pre-trial detention hearings, the defense theory was established and it was clear that the movant's brother, Norneilla-Morales, would testify; the only method to convey the defense theory to the jury. Accordingly, counsel and the movant discussed

16

whether he would testify.

Typically, during the second meeting, counsel meets with the client and draws three options a client generally has; namely: plea guilty, plea guilty with potential to cooperate and proceed to trial. Establishing what the client wants early on permits her to achieve the best result for her client, especially if cooperation is chosen. The movant was explained the three options he had, specifically the possibility of him pleading guilty. However, because the case was unusual in that the defendants were steadfast in their innocence, negotiating a plea was not the focus.

During some time in December, one of the attorneys in the case approached the government with a proposal. The plea negotiations were openly discussed among all of the parties and their respective attorneys, as such, the movant was present and had knowledge of a possible plea agreement. Pursuant to an email correspondence between counsel and another attorney on the case, it appeared that the government was not receptive to the deals, but rather would consider a global plea to the interference charge because it did not have a minimum mandatory.

Notwithstanding the communicated plea discussions, the movant was not interested in pleading guilty. The attorneys in the case felt compelled to reach out to the government regarding plea negotiations due to the high exposure the defendants faced. In addition to a global plea, the government provided a second option; the defendants could enter into an individual plea to a higher charge along with cooperation, which was also communicated to the movant, despite his disinterest.

The movant was informed about his right to remain silent or to

testify. He was further explained that a consequence of testifying included receiving a sentence enhancement for obstruction of justice. Moreover, counsel testified that the decision to testify is always made by the client and in this case specifically, because there was a mandatory minimum of 20 years and a possible two level enhancement for obstruction of justice, testifying did not weight heavily in his mind because anything in addition to the 20 years was negligible.

Ultimately, the movant testified, in part due to his brother's disappointing testimony. Moreover, because Norneilla-Morales' testimony reflected how the hijacking occurred towards the front of the plane, the movant's testimony regarding the events which unfolded in the back of the plane was necessary. After a discussion with the movant, it was a strategic decision for the movant to testify. The jurors needed to know that the defendants were six decent young men who were "duped". Although, counsel does not direct a client to testify, in this case, she thought it was a good idea.

Moreover, as part of the overall process to educate the movant, she discussed with him that if he decided to not take the stand, the jury could not make an adverse inference for failing to do so.

After the re-sentencing, counsel spoke with the movant regarding his appellate rights; she even sent him a hand delivered letter on May 1, 2007, memorializing their discussions. Moreover, it was learned that the movant filed a pro se motion for reconsideration. It was counsel's belief that the movant decided to forego an appeal in lieu of pursuing a rule 33, a motion for new trial based on newly discovered evidence.

Counsel, after delivering the May 1, 2007 letter, never received any messages from the movant directing her to file an appeal. Moreover, counsel explained that the movant and her secretary, who spoke Spanish, had a good relationship, therefore, there was no reason why she would not have received any messages.

On cross-examination, counsel admitted that had Norneilla-Morales' testimony come out the way the defense planned for, the movant's testimony would not have been needed. It was not feasible to determine whether the movant's testimony was necessary until after Norneilla-Morales testified. Notwithstanding, it was the movant's the decision to take the stand.

Counsel further testified that initiation for a potential resolution of the case occurred prior to informing the clients simply because the defendants were not predisposed to enter into a guilty plea. Counsels simply wanted to know whether there was anything out there their clients could find of interest. At no time did the movant approach counsel and asked her what was available to him. Moreover, counsel explained that in addition to practicing criminal law, she represents criminal citizens. Since the movant came to this country seeking freedom and desired to remain in the United States, any plea agreement would have resulted in immigration consequences. The potential immigration consequence was an issue that also played in connection with the government's reluctance to negotiate. One of the concerns was that the defendants may have faced more severe ramifications in Cuba than in the United States and due to the case's political ties, she was unsure what would become of the movant.

By the time re-sentencing occurred, counsel's relationship with the movant had changed. The movant began filing pro se

motions, which, according to counsel, had nothing to do with her basis to file a motion to withdraw as counsel. On May 2, 2007, counsel moved to withdraw, which she notified the movant on May 1, 2007 and suggested to the movant that he retain counsel to handle his motion for reconsideration. After re-sentencing, the movant never directed counsel to file a direct appeal. There was no reason for her not have filed a notice of appeal had he requested it, but her recollection was that he wanted to pursue another avenue, such as a rule 33 motion.

On re-direct, when questioned whether she would have continued acting as counsel until her motion to withdraw was granted, counsel responded yes, which explains why she filed a motion for reconsideration for the movant.

*Analysis:*

In this case it is disputed whether counsel, after re-sentencing, failed to file an appeal as requested to do so, whether counsel failed to advise him regarding the benefits of pleading guilty versus proceeding to trial and whether counsel failed to advise the movant of his right to exercise his Fifth Amendment privilege against self-incrimination at trial.

Having carefully attended to the testimony at the evidentiary hearing, the witnesses' demeanor and the record as a whole, the undersigned credits the testimony of movant's counsel, Attorney Jhones, that the movant never indicated he wanted to pursue a direct appeal, but rather his efforts were directed to pursing a motion for reconsideration in light of newly discovered evidence.

Even if it is found that the movant was silent on whether he

20

wished to file an appeal, counsel did not have an absolute duty to consult with the movant the advantages and disadvantages of an appeal. As discussed above, if the record is inconclusive as to whether the defendant requested an appeal and counsel thereafter did not consult with the defendant, counsel's performance is deficient when there is reason to think either (1)that a rational defendant would have wanted to appeal or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing. It is evident from the record that a reasonable defendant in the movant's situation would not have wanted to appeal, as he received a sentence at the low end of the guidelines. Moreover, it is axiomatic that the movant did not reasonably demonstrate to counsel that he was interested in appealing. Under these circumstances, counsel was not ineffective for failing to file an appeal.

Moreover, having carefully attended to the testimony of the witnesses at the evidentiary hearing and considered the entire record in this case, the undersigned credits counsel's testimony that she advised the movant of the benefits of pleading guilty versus proceeding to trial. This court credits counsel's testimony that she cautioned the movant that if he insisted on proceeding to trial, he could face an obstruction of justice enhancement. The undersigned also credits counsel's testimony that the movant was not interested in pleading guilty and insisted on proceeding to trial, despite the overwhelming evidence. The undersigned is persuaded that counsel properly advised the movant about the benefits of pleading guilty and that the movant understood that if he proceeded to trial and was convicted, he faced a minimum mandatory of 20 years.

Thus, the undersigned credits counsel's testimony that she met

with the movant and had discussions regarding the benefits of pleading guilty versus proceeding to trial. The court further finds counsel's testimony more credible and believes that the movant was properly advised about the consequences of pleading guilty versus going to trial and that despite counsel's advice, the movant insisted on proceeding to trial. The court further finds that the movant has failed to make a showing in this collateral proceeding that he wished to enter a guilty plea, nor that he was misadvised or prevented from doing so. Thus, the movant has failed to establish deficient performance or prejudice pursuant to <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).

Likewise, having carefully attended to the testimony of the witnesses at the evidentiary hearing and considered the entire record in this case, the undersigned credits counsel's testimony that she advised the movant of his right to testify. Thus, the undersigned credits counsel's testimony that she met with the movant and discussed his rights regarding testifying during trial. The court further finds that the movant has failed to make a showing in this collateral proceeding that he wished to not testify or that he was misadvised or compelled to do so. Thus, the movant has failed to establish deficient performance or prejudice pursuant to <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).

<u>Remaining Claims</u>

First, it should be noted that the foregoing claims could have been, but were not raised on direct appeal. Notwithstanding, construing the arguments made by the movant in support thereof, he appears to argue that counsel was ineffective for failing to pursue the claims. A claim of ineffective assistance of counsel may constitute cause for failure to previously raise the issue. <u>United</u>

States v. Breckenridge, 93 F.3d 132 (4th Cir. 1996). Attorney error, however, does not constitute cause for a procedural default unless it rises to the level of ineffective assistance of counsel under the test enunciated in Strickland v. Washington, 466 U.S. 668 (1984); Murray v. Carrier, 477 U.S. 478, 488 (1986). Thus, the claims will be identified in this Report, infra.

In order for the movant to prevail on a claim of ineffective assistance of counsel, he must establish that 1) his counsel's representation fell below an objective standard of reasonableness; and 2) but for the deficiency in representation, there is a reasonable probability that the result of the proceeding would have been different. Strickland v. Washington, 466 U.S. 668 (1984). A court may decline to reach the performance prong of the standard if it is convinced that the prejudice prong cannot be satisfied. Id. at 697; Waters v. Thomas, 46 F.3d 1506, 1510 (11th Cir. 1995). Prejudice in the sentencing context requires a showing that the sentence was increased due to counsel's error. Glover v. United States, 531 U.S. 198, 203-04 (2001).

Moreover, review of counsel's conduct is to be highly deferential. Spaziano v. Singletary, 36 F.3d 1028, 1039 (11th Cir. 1994), and second-guessing of an attorney's performance is not permitted. White v. Singletary, 972 F.2d 1218, 1220 ("Courts should at the start presume effectiveness and should always avoid second-guessing with the benefit of hindsight."); Atkins v. Singletary, 965 F.2d 952, 958 (11th Cir. 1992). Because a "wide range" of performance is constitutionally acceptable, "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." Rogers v. Zant, 13 F.2d 384, 386 (11th Cir. 1994).

In **claim two,** the movant asserts he was denied effective assistance of counsel when his attorney failed to argue at sentencing for an acceptance of responsibility adjustment and move for a downward departure based on post-offense rehabilitation. (Cv-DE#1:5). In support of his argument for downward departure, the movant argues that pursuant to U.S.S.G. §3E1.1 app. note(g), his attorney should have moved the court for an acceptance of responsibility reduction based on his rehabilitative efforts. (Id.).

However, at the initial sentencing hearing, the District Court granted the government's motion for an obstruction of justice enhancement based on the movant's false testimony at trial. (Cv-10,Ex.B). Thereafter, on April 25, 2007, at the re-sentencing hearing, the District Court imposed an additional two years' imprisonment for perjury. (Cr-DE#597:19). "The comments to U.S.S.G. §3C1.1 state that committing perjury and providing materially false statements to a judge are grounds for applying the [obstruction of justice] enhancement." United States v. Golden, 2008 WL 2588640 (11th Cir. 2008)(unpublished) citing U.S.S.G. §3E1.1 comment n.4; United States v. Singh, 291 F.3d 756, 765 (11th Cir. 2002). Therefore, according to the Eleventh Circuit holding in Golden, the two-level decrease pursuant to U.S.S.G. §3E1.1 for acceptance of responsibility is unavailable when the defendant received an enhancement for obstruction of justice. Id. Under these circumstances, the movant cannot establish prejudice pursuant to Strickland, supra and is entitled to no relief from this claim.

Moreover, counsel was also not ineffective for failing to move for a downward departure based on the movant's post-offense rehabilitation. Pursuant to the Eleventh Circuit court decision in Mesa, downward adjustments for post-offense rehabilitation must

occur along the criminal history axis, rather than the offense level axis, therefore a defendant sentenced at the lowest possible criminal history category under the guidelines is not eligible as a matter of law for any further adjustment for post-offense rehabilitation. United States v. Mesa, 247 F.3d 1165 (11th Cir.), cert. denied, 534 U.S. 912 (2001) citing United States v. Pickering, 178 F.3d 1168 (11th Cir. 1999); see also United States v. Stuart, 384 F.3d 1243, 1248 (11th Cir. 2004). Accordingly, because the movant was sentenced under a criminal history category of I, he was not eligible for any further adjustments.

Under these circumstances, the movant cannot establish prejudice pursuant to Strickland, supra and is entitled to no relief from this claim.

In **claim three**, the movant asserts he was denied effective assistance of counsel when his attorney failed to move to suppress the movant's post-arrest statement. (Cv-DE#1:6-7).

Co-defendant Neudis Infantes Hernandez, filed a motion to suppress his post-arrest statement arguing that it was given in violation of his Miranda rights. In support thereof, he argued that after providing an incriminating statement, he was then provided with the "Advice of Rights" form which he signed. (Cr-DE#82). After being informed of his rights, Hernandez was asked whether his previous incriminating statement was truthful and freely provided, which he affirmed. (Id.). At a hearing on this matter, Magistrate Judge O'Sullivan directed any defendant who wanted to adopt Hernandez' motion to file a motion with the Court and provide to the Court, the particular facts that relate to that defendant. Subsequently, only co-defendant Yainer Olivares Samon moved to join in Hernandez' motion to suppress statements, as he too, was

similarly situated. (Cr-DE#147).

The government filed a response arguing that although the report is clear that defendants were administered their Miranda rights after their statements were provided, nonetheless, the interviews were voluntarily made and the defendants thereafter affirmed their pre-Miranda statements. (Cr-DE#100). Accordingly, their motions to suppress should be denied.

The District Court adopted Magistrate Judge O'Sullivan's Report and Recommendation granting Hernandez' and Samon's motions to suppress their post-arrest statements. (Cr-DEs#191,213).

Consequently, the movant, in this collateral proceeding, argues that counsel was ineffective for failing to join Hernandez' motion to suppress. However, the movant fails to recognize that he was not similarly situated to those co-defendants, as his post-arrest statement was given only after he was advised of his rights in accordance with Miranda. The Florida Department of Law Enforcement Investigative Report regarding the interview of the movant on March 20, 2003 reflects that he was read his Miranda rights and he stated that he understood his rights and still wanted to speak with investigators. (Cr-DE#62, bate-stamped pages 0003-0004).

In contrast, the Investigative Reports of both Hernandez and Samon reflect that only after their interviews, were they informed of their Miranda rights via an "Advice of Rights" form which they signed. (Cr-DEs#82,147). Subsequent to signing the forms, they were asked whether their previous statements were freely given and if they were telling the truth at the time, which they affirmed. (Id.).

Moreover, during trial, Agent Heck testified that she advised the movant of his Miranda rights prior to taking his statement. (Cr-DE#336:46-47). As such, defense counsel did not have a good faith basis to join co-defendant's motion to suppress post-arrest statements. Under these circumstances, the movant cannot establish prejudice pursuant to <u>Strickland</u>, <u>supra</u> and is entitled to no relief from this claim.

In **claim six**, the movant asserts he was denied effective assistance of counsel when his attorney failed to challenge a two-level enhancement pursuant to U.S.S.G. §3A1.3 for restraint of victim at sentencing. (Cv-DE#1:12).

As the government clearly points out, and the movant concedes in his reply (Cv-DE#10), there was no two-level adjustment for restraint of victim pursuant to U.S.S.G. §3A1.3 added to his sentence. (Cv-DE#8,Ex.B). Accordingly, the movant's claim of ineffective assistance of counsel is without merit.

In **claim seven**, the movant asserts he was denied effective assistance of counsel when his attorney failed to object to the grouping of the offenses in the PSI. (Cv-DE#1:12). Specifically, the movant argues that pursuant to U.S.S.G. §3D1.2, the offenses for which he was convicted are specifically excluded "('all offenses in Chapter Two, Part A are excluded from grouping') from grouping," thus resulting in an increased sentence for Counts Three and Four. (<u>Id.</u>). Instead of a base offense level of 18 or 30, the movant received a base offense level of 38. (<u>Id.</u>). This claim is without merit.

The PSI, pursuant to U.S.S.G. §3D1.1(a)(1), determined that because the movant was convicted of more than one count, the court

27

had to group his counts resulting in conviction in distinct Groups of Closely Related Counts, which is done by applying U.S.S.G. §3D1.2. (PSI¶23). According to U.S.S.G. §3D1.2(b),Counts One, Two, Three and Four were grouped together because the counts involved the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.

However, the movant argues that pursuant to subsection (d), of U.S.S.G. §3D1.2, which states "when the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior," then offenses in Chapter Two, Part A, the offenses committed in the underlying criminal case, are specifically excluded. However, the movant's offenses, as is evident from the PSI, were not grouped together pursuant to subsection (d) and therefore, his Chapter Two offenses are not excluded. Consequently, there was no basis for counsel to object to the grouping of the movant's counts as doing so would have been nonmeritorious.

<u>Conclusion</u>

It is therefore recommended that the motion to vacate be denied.

Objections to this report may be filed with the District Judge within ten days of receipt of a copy of the report.

Dated this 24th day of July, 2009.


_____

UNITED STATES MAGISTRATE JUDGE


cc:  Philip Horowitz, Esq.
     Two Datran Center
     9130 South Dadeland Blvd.
     Suite 1910
     Miami, FL 33156

     Anne Ruth Schltz, AUSA
     United States Attorney's Office
     99 NE 4 Street
     Miami, FL 33132
     Phone: 305-961-9117
     Fax: 530-7941

     Harry C. Wallace, AUSA
     United States Attorney's Office
     500 East Broward Blvd.
     Ft. Lauderdale, FL 33394
     Phone: 954-356-7255
     Fax: 954-356-7336